1

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF CALIFORNIA

5

6    SEAN KEVIN PERRY,                          Case No.  14-cv-01411-JSC

7              Plaintiff,

8         v.

9                                               ORDER ON CROSS-MOTIONS FOR
                                                SUMMARY JUDGMENT
10   CAROLYN W. COLVIN,
                                                Re: Dkt. Nos. 17, 20
11             Defendant.

12

13       Plaintiff Sean Kevin Perry ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g),

14   seeking judicial review of a final decision by Defendant Carolyn W. Colvin, the Commissioner of

15   the Social Security Administration ("Defendant" or "Commissioner"), denying his application for

16   disability benefits.  Now pending before the Court is Plaintiff's motion for summary judgment and

17   Defendant's cross-motion for summary judgment.  (Dkt. Nos. 17, 20.)  After carefully considering

18   the parties' submissions, the Court GRANTS Plaintiff's motion in part, DENIES Defendant's

19   cross-motion, and REMANDS for a new hearing consistent with this Order.

20                                    **LEGAL STANDARD**

21       A claimant is considered "disabled" under the Social Security Act if he meets two

22   requirements.  *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

23   First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by

24   reason of any medically determinable physical or mental impairment which can be expected to

25   result in death or which has lasted or can be expected to last for a continuous period of not less

26   than 12 months."  42 U.S.C. § 423(d)(1)(A).  Second, the impairment or impairments must be

27   severe enough that he is unable to do his previous work and cannot, based on his age, education,

28   and work experience "engage in any other kind of substantial gainful work which exists in the

United States District Court
Northern District of California

national economy." 42 U.S.C. § 423(d)(2)(A).  To determine whether a claimant is disabled, an

administrative law judge ("ALJ") is required to employ a five-step sequential analysis, examining:

> (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant  has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual functional capacity," the claimant can still do his or her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work."

*Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see also* 20 C.F.R. §§ 404.1520(a),

416.920(a).

## PROCEDURAL HISTORY

Plaintiff applied for Supplemental Security Income ("SSI") on March 11, 2011.  (AR 139.)

He alleged disability beginning December 31, 2007 caused by a number of physical conditions

and mental health impairments.  (AR 139, 322.)  The Social Security Administration ("SSA")

denied his claims initially on July 14, 2011 and again on reconsideration on June 5, 2012.  (AR 86,

98.)  Plaintiff then filed a request for a hearing before an ALJ.  (AR 104.)

On January 9, 2013, Plaintiff, his non-attorney representative, and vocational expert

("VE") Malcolm Brodzinsky, appeared for the hearing before ALJ Maxine Benmour in San

Rafael, California.  (AR 17.)  Plaintiff and the VE both testified at the hearing.  (AR 32.)  The ALJ

issued a written decision denying Plaintiff's application and finding that he was not disabled

within the meaning of the Social Security Act and its regulations.  (AR 14-26.)  Plaintiff filed a

request for review (AR 12-13), which the Appeals Council denied on February 11, 2014.  (AR 1-

3.)  On March 26, 2014, Plaintiff initiated the current action, seeking judicial review of the SSA's

disability determination pursuant to 42 U.S.C. § 405(g).  (Dkt. No. 1.)

## FACTUAL BACKGROUND

Plaintiff, now 45, alleges that he has been disabled due to his physical and mental

condition since December 31, 2007.  (AR 139.)  Plaintiff sustained an injury when he was 18

years old that resulted in paralysis of his right leg and consequently a chronic right lower

extremity foot drop.[1]  (AR 322.)  Plaintiff has endured multiple surgeries for chronic foot drop and the numbness that it causes.  (*Id.*)  He also suffers from asthma, recurrent allergies with sinus symptoms, benign prostatic hyperplasia ("BPH")—a benign increase in prostate size—with lower urinary tract symptoms, and a tear of the right talofibular ligament in his right ankle.  (*Id.*; AR 271-277.)  Plaintiff reports a number of mental health issues including anxiety, depression, panic attacks, and insomnia.  (AR 322-323.)  He previously worked as an In-Home Supportive Services caregiver for three to four months and a part-time pizza-dough roller for about one year.  (AR 19, 25, 36.)

## I.     Medical History & Evaluations

### A.     2009 to 2012 Medical History[2]

As a result of Plaintiff's medical condition, he has seen a variety of physicians and primary care specialists to help diagnose and cope with his symptoms.  A discussion of the relevant medical evidence follows.

Plaintiff visited the Marin Community Center for medical treatment regularly from June 15, 2009 to May 15, 2012.  (AR 271-324.)  Medical reports from 2009 document his asthma, depression, chronic low back pain, chronic right foot drop, chronic left hip pain, and BPH.  (AR 271-277.)  In October 2009, Plaintiff suffered lower back pain and requested an x-ray to examine the issue.  (AR 273.)  The lumbar spine x-ray showed alignment of the spine within normal limits, height of the vertebral bodies and intervertebral disc normal, and facet joints intact.  (AR 296.)  Plaintiff also visited an in-house chiropractor, Dr. Bliss, in October 2009, and the notes from this visit document chronic lower back pain; history of a right tibia fracture at the age of 19; left knee, ankle and hip pain; depression; and sinus congestion.  (AR 274.)  His medications during this period included:  Wellbutrin,[3] Nexium,[4] Ventolin,[5] Vicodin,[6] and Gabapentin.[7]  (AR 271-77.)

---

[1] *See* Foot Drop, WebMD, http://www.webmd.com/a-to-z-guides/foot-drop-causes-symptoms-treatments (last visited Feb. 27, 2015).

[2] While records indicate that different physicians cared for Plaintiff during these visits, Dr. Miranda Von Dornum is often listed as Plaintiff's primary care physician.  (AR 271-324.)

[3] Wellbutrin is an antidepressant medication prescribed to treat major depressive disorder and seasonal affective disorder among other purposes. *Wellbutrin*, DRUGS.com,

United States District Court
Northern District of California

In early 2010, Plaintiff's medical assessments noted that he suffered from bronchitis and sinusitis, exacerbated by between five and ten years of smoking.  (AR 278-280.)  He continued taking Wellbutrin, Vicodin, and Gabapentin, while the record also indicates use of Proventil,[8] Terazosin,[9] and Combivent.[10]  (*Id.*)  In July 2010, Plaintiff's chief complaints were right knee and left hip pain.  (AR 282.)  Imaging results from August 2010 indicated minimal degenerative joint disease in the right knee and no abnormalities in the left hip.  (AR 285, 294.)  That September, Plaintiff continued to experience similar physical ailments while also suffering from anxiety, panic attacks, and anger management issues.  (AR 283-285.)  Medical providers tracked sinusitis, asthma, and BPH through the end of 2010.  (AR 283-286.)

In 2011, Plaintiff reported the same physical and mental ailments and also made several trips to the emergency room.  The treating physician indicated that Plaintiff had "moderate" symptoms of anxiety, sleep disturbance, anger, BPH, allergic rhinitis, and gastroesophageal reflux

---

http://www.drugs.com/wellbutrin.html (last visited Jan. 27, 2015).

[4] Nexium is a proton pump inhibitor used to treat symptoms of gastroesophageal reflux disease (GERD) and other issues resulting from excessive stomach acid.  *Nexium*, DRUGS.com, http://www.drugs.com/nexium.html (last visited Jan. 27, 2015).

[5] Ventolin is a bronchodilator that increases air flow to the lungs and relaxes muscles in the airways.  *Ventolin*, DRUGS.com, http://www.drugs.com/ventolin.html (last visited Jan. 27, 2015).

[6] Vicodin (acetaminophen and hydrocordone) is a narcotic pain reliever for moderate to severe pain.  *Vicodin*, DRUGS.com, http://www.drugs.com/vicodin.html (last visited Jan. 27, 2015).

[7] Gabapentin is an anti-epileptic medication that affects chemicals and nerves that cause seizures and some types of pain.  Gebapentin is used to treat nerve pain caused by herpes, shingles, restless leg syndrome, and seizures.  *Gebapentin*, DRUGS.com, http://www.drugs.com/gabapentin.html (last visited Jan. 27, 2015).

[8] Proventil (albuterol) is a bronchodilator that relaxes muscles in the airways and increases air passage to the lungs.  *Proventil*, DRUGS.com, http://www.drugs.com/proventil.html (last visited Jan. 27, 2015).

[9] Terazosin relaxes veins and arteries to help blood pass through.  It also relaxes prostate muscles and the bladder neck, making it easier to urinate.  *Terazosin*, DRUGS.com, http://www.drugs.com/terazosin.html (last visited Jan. 27, 2015).

[10] Combivent is a metered-dose inhaler containing albuterol and ipratropium.  It relaxes muscles in the airways and increase air flow to the lungs.  *Combivent*, DRUGS.com, http://www.drugs.com/combivent.html (last visited Jan. 27, 2015).

disease ("GERD") in a March, 2011 visit.  (AR 370.)  On May 11, 2011, Plaintiff went to the emergency room after slipping and falling on his right forearm.  (AR 374.)  He had a benign and "very small umbilical hernia" with no other abnormalities.  (*Id*.)

On December 8, 2011, Plaintiff arrived at the emergency room complaining of a left-sided headache.  (AR 376.)  A CT scan showed a "small polyp or retention on the left side," for which doctors prescribed Percocet.  (AR 377.)  Plaintiff returned to the emergency room four days later making the same complaint and requesting more pain medication.  (AR 378.)  The medical history indicates that Plaintiff was "positive for diagnosis of bipolar illness," and the diagnosis for his visit was a "probable sinus headache."  (AR 379-380.)

Medical records from 2012 similarly document sinus infections, sharp pain in Plaintiff's left leg, along with complaints that his left leg had been uncontrollably giving out on him, BPH, allergy issues, GERD, anxiety, and depression.  (AR 321, 327.)  Notes from a May 15, 2012 visit document that Plaintiff stopped taking all medication prescribed for depression.  (AR 324.)  The record quotes Plaintiff as saying, "'I feel a lot better . . . I'm not depressed anymore, everyday that's gone by I have a lot of energy.'"  (*Id*.)  Plaintiff also reported experiencing significantly fewer panic attacks.  (*Id*.)

**B.    Medical Evaluations**

Apart from routine and emergency medical visits, Plaintiff underwent several examinations to measure his functional capacity in support of his application for disability benefits.  Dr. Calvin Pon examined Plaintiff and completed an evaluation at the SSA's request.  Dr. Carolyn Shore, whose status as either a treating or examining physician is contested, also completed an evaluation of Plaintiff's condition.  Dr. Erik Schten, who treated Plaintiff, wrote a letter to the SSA on Plaintiff's behalf.  Treating nurse practitioner Aaron Miller also wrote a letter to the SSA at Plaintiff's request.  Lastly, Psychologist Dr. Tania Shertock, who examined Plaintiff, completed a mental health evaluation at the SSA's request.

**1.    Dr. Calvin Pon**

On May 17, 2011, Dr. Pon, a Medical Consultative Examiner, met with Plaintiff and conducted a consultative orthopedic disability evaluation.  (AR 306.)  At the time of the

United States District Court
Northern District of California

5

examination, Plaintiff was 41 years old and complained of right knee pain, left hip pain, lower

back pain, history of right tibia fibular fracture from a motor vehicle accident when he was 18

years old, and a complete right foot drop.  (AR 306, 308.)  Dr. Pon observed atrophy of Plaintiff's

right calf and a "slight limp on the right during ambulation."  (AR 307.)  Dr. Pon noted that

Plaintiff was able to squat about one-third of the way down but was limited by pain in his right

knee.  (*Id.*)  In assessing Plaintiff's functional capacity, Dr. Pon stated:

> The claimant should be able to stand and/or walk for a total of 4 to 6
> hours during an 8 hour workday.  He should be able to sit for a total
> of 6 hours during an 8 hour workday.  Stooping should be limited to
> occasionally.  Crouching kneeling and squatting should be limited to
> occasionally.   Climbing stairs, ladders and crawling should be
> limited to occasionally . . . In spite of his complaint of right knee
> pain, he should still be able to perform pushing right leg/foot control
> frequently.  He should be able to lift and carry frequently 10+ lbs.
> and occasionally 20+  lbs.  (AR 308.)

2.    Dr. Carolyn Shore

Plaintiff met with Dr. Shore of Marin Community Clinics on January 7, 2013.  (AR 409.)

She completed a "Disorders of the Spine and Feet Treating Physician Data Sheet"[11] on Plaintiff's

behalf.  (*Id.*)  Dr. Shore reported first seeing Plaintiff on January 7, 2013, the day she completed

the form, which she did based on Plaintiff's medical records from Marin Community Clinics and

her personal observations of Plaintiff.  (*Id.*)  Dr. Shore documented Plaintiff's right foot drop,

prior surgeries, and weakness in his lower right leg that affected his hip and knee.  (AR 409-410.)

She noted that Plaintiff had reduced range of motion in his right foot, abnormal gait, muscle

spasm, and atrophy.  (AR 410.)  Dr. Shore indicated that Plaintiff could walk "2-3 blocks" without

rest or severe pain, could sit for more than 2 hours at one time, stand for 30-60 minutes at one

time, sit for at least 6 hours, and stand for less than 2 hours in an 8-hour work day.  (AR 411.)  She

further opined that Plaintiff could frequently twist and stoop, occasionally climb stairs, but only

rarely crouch, squat, or climb ladders.  (AR 412.)  Dr. Shore also found that Plaintiff would need

unscheduled breaks every 30-60 minutes in an 8-hour workday and estimated that as a result of his

impairments, Plaintiff likely would be absent from work about three days per month.  (*Id.*)

---

[11] This questionnaire was originally sent to Dr. Schten to clarify the letter he had previously
written on Plaintiff's behalf.  (AR 409.)  Dr. Shore completed the form instead.  (*Id.*)

United States District Court
Northern District of California

United States District Court
Northern District of California

### 3.   Dr. Erik Schten

Plaintiff met with Dr. Schten on several occasions when he visited Marin Community Clinics.  (*See, e.g.*, AR 296, 322, 331, 387.)  Dr. Schten treated Plaintiff's recurrent medical issues.  (*Id.*)  In a letter dated May 14, 2012, Dr. Schten noted that Plaintiff suffered from a number of ongoing medical illnesses including chronic right lower extremity foot drop, history of multiple surgeries for this issue, history of a tear of the talofibular ligament in the right ankle, asthma, recurrent allergies with sinus symptoms, and BPH with lower urinary tract symptoms.  (AR 322.)  With respect to the physical ailments that Plaintiff complained of, Dr. Schten wrote that "[f]rom a medical perspective there has been little basis for a medical disability other than his chronic footdrop[.]"  (*Id.*)  He further opined that Plaintiff "would be limited somewhat in terms of walking and carrying[,]" but "should have no significant limitations to sitting, standing, handling objects, hearing, speaking, or traveling."  (*Id.*)  However, Dr. Schten concluded that the most significant portion of Plaintiff's disability was due to mental illness; he deferred discussion and consideration of Plaintiff's mental health status to nurse practitioner Aaron Miller.  (*Id.*)

### 4.   Aaron Miller, Nurse Practitioner

Mr. Miller is a Family Psychiatric Nurse Practitioner at Marin Community Clinics who met with Plaintiff on a regular basis for over a year.  (AR 323.)  On May 14, 2012, Mr. Miller wrote that Plaintiff's generalized anxiety and recurrent depressive episodes have significantly impacted his social and work life, concluding that Plaintiff has had limited benefit from treatment.  (*Id.*)

### 5.   Tania Shertock, Ph.D.

Dr. Shertock is a Psychological Consultative Examiner.  (AR 23.)  Plaintiff met with her on May 12, 2011 at SSA's request.  (AR 300.)  Dr. Shertock based her examination on prior records from Marin Community Clinics, her own observations of Plaintiff, and Plaintiff's self-reporting.  (*Id.*)  Her diagnosis included:  polysubstance dependence (noting uncertainty about whether Plaintiff was still using), mood disorder, generalized anxiety disorder, posttraumatic stress disorder, and personality disorder with antisocial features.  (AR 303.)  Based on a scale from

United States District Court
Northern District of California

1    0 to 100, Dr. Shertock gave Plaintiff a Global Assessment of Functioning ("GAF")[12] score of 50,

2    meaning that Plaintiff exhibited some serious mental health symptoms or serious social

3    impairments.  (AR 303.)  Although he denied recent use of methamphetamine at the time of the

4    evaluation, Dr. Shertock wrote that Plaintiff appeared aggressive and sullen, and exhibited

5    behavior consistent with methamphetamine intoxication.  (AR 301.)  In assessing his functional

6    capacity, Dr. Shertock documented generalized anxiety disorder and anger issues.  (AR 302.)  She

7    was unsure whether the anxiety and anger could be attributed to methamphetamine use or PTSD.

8    (*Id.*)  Due to Plaintiff's interpersonal difficulties, Dr. Shertock opined that he would struggle with

9    interacting with others and responding to work stress.  (*Id.*)  She was unable to predict whether he

10   would be able to adjust to a routine work schedule, though elsewhere she stated that Plaintiff

11   "would have difficulty maintaining a schedule on a consistent basis."  (*Compare* AR 302, *with* AR

12   303.)  However, she also concluded that Plaintiff was capable of concentrating and performing

13   simple repetitive tasks and some detailed tasks depending on drug use.  (AR 302)

## II.    ALJ Hearing Testimony

15         On January 9, 2013, Plaintiff appeared at his scheduled hearing before the ALJ in San

16   Rafael, California.  (AR 30.)  Plaintiff and the VE both testified at the hearing.  (*Id.*)

17         A.    Plaintiff's Testimony

18         Plaintiff suffers from pain resulting from his right foot drop and chronic lower back pain.

19   (AR 38, 28.)  He has suffered from right foot drop since he was 18 or 19, causing him to trip and

20   fall often.  (AR 38.)  He constantly has to lift his leg in order to compensate for the dropped foot.

21   (AR 39.)  This strains his hips and knee, and his right foot is frequently numb as a result.  (*Id.*)

22   The pain in his right hip is "excruciating," requiring him to take Motrin and/or Tylenol daily to

---

[12] The GAF is a numeric scale that mental health clinicians and physicians use to rate the social, occupational, and psychological functioning of adults.  The range between "41-50" signifies serious symptoms such as suicidal ideation, severe obsessional rituals, or frequent rituals or any serious impairment in social, occupational, or school functioning such as a lack of friends, inability to keep a job or work.  A score of 51-60 implies moderate symptoms such as flat affect, circumlocutory speech, occasional panic attacks or moderate difficulty in social, occupational, or school functioning or moderate difficulty in social, occupational, or school functioning.  Global Assessment of Functioning, WIKIPEDIA.ORG, http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning (last visited Feb. 4, 2015).

manage the pain.  (AR 40-41.)  As a result of the pain, he could only walk for a couple of blocks without a cane before needing a break.  (AR 41.)  He could sit for no more than 15 minutes without becoming uncomfortable and could stand for no more than 30 minutes without triggering pain in his hip.  (AR 42.)  He does not experience pain in his upper body.  (*Id*. (noting that his upper body is "okay").)

Regarding his mental conditions, Plaintiff suffers from PTSD, major depression, and anxiety.  (*Id*.)  The PTSD causes him to spend most of his time in his room.  (*Id*.)  He experiences panic attacks almost daily that inhibit his ability to sleep well at night.  (AR 44.)  He takes Diazepam[13] and Lorazepam[14] for the panic attacks and depression.  (AR 43.)

He lives with his wife and four children.  (*Id*.)  He helps his children with homework, does dishes, vacuums, and spends his free time sleeping, watching TV, and listening to music.  (AR 43, 46, 50.)

In addition to Plaintiff's live testimony before the ALJ, Plaintiff also submitted documentary evidence providing more background about his condition.  (AR 204-214.)  In a "Function Report" dated April 2, 2011, Plaintiff wrote that his daily activities include:  taking the kids to school, driving his wife to the bus stop, cleaning the house, picking the children up from school, and cooking dinner.  (AR 207.)  Plaintiff also wrote that he enjoys reading, annual camping trips, going to college, and visiting his friends.  (AR 211.)  He described only being able to walk a flight of stairs before needing a five-minute rest, and having a poor ability to handle stress and changes in routine.  (AR 212-213.)  In his appeal, Plaintiff added even more details:  he suffers from consistent pain in his left hip and right knee, ongoing headaches, sinusitis, and a prostate condition.  (AR 227-228.)  He also wrote that he has a poor memory and relies on his wife to take care of financial matters.  (AR 227.)  Finally, Plaintiff wrote that his pain and depression render him unable to properly care for his personal needs.  (AR 231.)

---

[13] Diazepam impacts chemicals in the brain that may be unbalanced and cause anxiety.  *Diazepam*, DRUGS.COM, http://www.drugs.com/diazepam.html (last visited Feb. 3, 2015).

[14] Lorazepam affects chemicals in the brain that may be unbalanced in order to treat anxiety disorders.  *Lorazepam*, DRUGS.COM, http://www.drugs.com/lorazepam.html (last visited Feb. 3, 2015).

United States District Court
Northern District of California

B.     Vocational Expert's ("VE") Testimony

The ALJ presented the VE with a hypothetical of an individual of Plaintiff's age, education, and work history who could engage in limited contact with the public; lift and carry 20 pounds occasionally and 10 pounds frequently; sit for 6 hours in an 8-hour work day; occasionally push and pull with the right lower extremity; occasionally balance, stoop, kneel, crouch, and crawl; but could never work around uneven terrain, fumes, odors, dust, gases, and poor ventilation.  (AR 52.)  The VE testified that such an individual could perform light unskilled work as well as sedentary unskilled work.  (*Id*.)  He or she could work as a small parts assembler (light, DOT 739.687-030, SVP 2, of which 1,000 jobs exist locally), small products assembler (light, DOT 706.684-022, SVP 2, of which 700-1,000 jobs exist locally), and final assembler of optical goods (sedentary, DOT 713.687-0148, of which 1,000-1,200 jobs exist locally).  (AR 53-54.)

The ALJ then modified the hypothetical, asking whether the results would change if, in addition to the conditions listed above, the person had to alternate between sitting and standing— alternating between sitting for 30 minutes and standing for 5 minutes throughout the day.  (AR 54.)  The VE testified that such a variation to the hypothetical would not change his conclusion that the person would be able to work in the above-listed jobs.  (AR 54-55.)  Lastly, the VE testified that there were no jobs for an individual who had to be absent from work 3 times per month.  (AR 55.)

**III.     The ALJ's Five-Step Evaluation**

In a January 18, 2013 decision, the ALJ found Plaintiff not disabled under Section 1614(a)(3)(A) of the Social Security Act using the five-step disability analysis.  (AR 14-26.)  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 2011, the application date.[15]  (AR 19.)  At the second step, the ALJ found that Plaintiff had the following severe impairments:  anxiety disorder, depression, back pain, knee pain, chronic foot drop, polysubstance dependence, and asthma.  (*Id*.)

---

[15] The ALJ documented March 8, 2011 as the date on which Plaintiff submitted his application for benefits.  (AR 19.)  However, the record demonstrates that Plaintiff applied for benefits on March 11, 2011.  (AR 139.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1       At the third step, the ALJ found that Plaintiff did not have impairments or a combination of

2   impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part

3   404, Subpart P, Appendix 1.  (*Id*.)  Considering Plaintiff's mental impairments, under Section

4   12.04, the ALJ concluded that the evidence does not establish that Plaintiff satisfies the

5   "'paragraph B' criteria[,]" which require two of the following:  "marked restriction of activities of

6   daily living; marked difficulties in maintaining social functioning; marked difficulties in

7   maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of

8   extended duration."  (AR 20.)  The ALJ found Plaintiff was mildly limited in activities of daily

9   living, that he exhibited moderate difficulties in social functioning, concentration, persistence, or

10  pace, but that he experienced no decompensation episodes of extended duration.  (*Id*.)

11      At the fourth step, the ALJ concluded that Plaintiff retained the residual functional capacity

12  ("RFC") to perform light work, limited to unskilled work with occasional contact with the public;

13  sitting limited to 6 hours; standing or walking limited to 2 hours; occasional lifting or carrying of

14  20 pounds and frequent lifting or carrying of up to 10 pounds; occasional pushing or pulling with

15  the right lower extremity; never climbing ladders, ropes, or scaffolding and occasional climbing

16  ramps and stairs; never working around hazards, fumes, odors, dusts, gases, or poor ventilation.

17  (AR 20.)  In reaching this conclusion, the ALJ found that Plaintiff's medically determinable

18  impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's

19  "statements concerning the intensity, persistence, and limiting effects of these symptoms are not

20  entirely credible."  (AR 21.)

21      Regarding Plaintiff's physical impairments, the ALJ gave great weight to the assessment of

22  the consultative examiner Dr. Pon.  (*Id*.)  The ALJ gave little weight to Dr. Shore's medical source

23  statement because it was not consistent with other treatment notes and was based on Plaintiff's

24  subjective complaints.  (AR 23.)  She concluded that there was no basis in the treatment notes for

25  Dr. Shore's opinion that Plaintiff would be absent from work three days per month, or that he

26  needs unscheduled work breaks and a sit/stand option.  (AR 24.)  However, the ALJ gave great

27  weight to Dr. Schten's opinion that Plaintiff did not suffer any significant physical disability.  (*Id*.)

28  She did so based on Dr. Schten's status as a treating physician, more familiar with Plaintiff than

11

1    Dr. Shore, and because of the consistency of his opinion with other evidence.  (*Id*.)

2         Regarding Plaintiff's mental impairments, the ALJ gave great weight to Dr. Shertock's

3    opinion given its consistency with the record as a whole.  (AR 22.)  Although the ALJ considered

4    the opinion of nurse practitioner Aaron Miller, she does not appear to have assigned to it a specific

5    amount of weight.  (*Id*.)

6         At step five, the ALJ found that Plaintiff had no relevant past work experience, but found

7    that there was other work in the national economy that Plaintiff could perform, such as that of a

8    small parts assembler, a small products assembler, or a final assembler of optical goods.  (AR 25.)

9    About 1000 of each of these jobs exists locally.  (*Id*.)  The ALJ therefore concluded that Plaintiff

10   was not disabled under the Social Security Act.  (AR 26.)

**STANDARD OF REVIEW**

12        Pursuant to 42 U.S.C. § 405(g), the Court has authority to review an ALJ's decision to

13   deny benefits.  When exercising this authority, however, the "Social Security Administration's

14   disability determination should be upheld unless it contains legal error or is not supported by

15   substantial evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *see also Andrews v.*

16   *Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.

17   1989).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

18   adequate to support a conclusion"; it is "more than a mere scintilla, but may be less than a

19   preponderance."  *Molina*, 674 F.3d at 1110-11 (internal citations and quotation marks omitted);

20   *Andrews*, 53 F.3d at 1039 (same).  To determine whether the ALJ's decision is supported by

21   substantial evidence, the reviewing court "must consider the entire record as a whole and may not

22   affirm simply by isolating a specific quantum of supporting evidence."  *Hill v. Astrue*, 698 F.3d

23   1153, 1159 (9th Cir. 2012) (internal citations and quotation marks omitted); *see also Andrews*, 53

24   F.3d at 1039 ("To determine whether substantial evidence supports the ALJ's decision, we review

25   the administrative record as a whole, weighing both the evidence that supports and that which

26   detracts from the ALJ's conclusion.").

27        Determinations of credibility, resolution of conflicts in medical testimony and all other

28   ambiguities are roles reserved for the ALJ.  *See Andrews*, 53 F.3d at 1039; *Magallenes*, 881 F.2d

United States District Court
Northern District of California

at 750.  "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal citations and quotation marks omitted); *see also Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion.").  "The court may not engage in second-guessing."  *Tommasetti*, 533 F.3d at 1039.  "It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the Commissioner's determination as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, not the Court's, to resolve conflicts in the evidence."  *Bertrand v. Astrue*, No. 08-CV-00147-BAK, 2009 WL 3112321, at *4 (E.D. Cal. Sept. 23, 2009).  Similarly, "[a] decision of the ALJ will not be reversed for errors that are harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

However, the Court can only affirm the ALJ's findings based on reasoning that the ALJ herself asserted.  *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).  In other words, the Court's consideration is limited to "the grounds articulated by the agency[.]"  *Cequerra v. Sec'y*, 933 F.2d 735, 738 (9th Cir. 1991).

## DISCUSSION

Plaintiff's motion for summary judgment challenges three aspects of the ALJ's decision. First, Plaintiff contends that the ALJ failed to properly weigh the opinions of his treating and non-treating physicians.  (Dkt. No. 17 at 13.)  Second, Plaintiff urges that the ALJ failed to properly evaluate the credibility of his testimony.  (*Id*. at 18.)  Third, Plaintiff argues that the ALJ's RFC determination lacks substantial evidentiary support and as a result, the hypothetical that the ALJ posed to the VE—and that served as the basis of the ALJ's decision—was also unsupported by the record.  (*Id*. at 21.)  The Court will address each in turn.

## I.     The ALJ's Consideration of the Medical Evidence

The lion's share of Plaintiff's motion insists that the ALJ did not assign the proper weight to certain physicians' testimony.

### A.     The Standard for Weighing Medical Evidence

As a threshold matter, the ALJ must consider all medical opinion evidence.  *Tommasetti*,

United States District Court
Northern District of California

533 F.3d at 1041 (citing 20 C.F.R. § 404.1527(b)).  However, the Ninth Circuit has "developed standards that guide [its] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  Specifically, a reviewing court must "distinguish among the opinions of three types of physicians:  (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The opinion of each is accorded a different level of deference, as "the opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).  Courts afford medical opinions of a treating physician superior weight because these physicians are in a special position to know plaintiffs as individuals and the continuity of the treatment improves their ability to understand and assess an individual's medical concerns. *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).  If a treating physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence. *See Ryan*, 528 F.3d at 1198.  The ALJ assigns "controlling weight" to a treating doctor's opinion where medically approved diagnostic techniques support the opinion and the opinion is consistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(d)(2); *Orn*, 495 F.3d at 632-33.

When determining which medical opinion should control, an ALJ looks to factors including the length of the treatment relationship, frequency of examination, nature and extent of treatment relationship, consistency of opinion, evidence supporting the opinion, and the doctor's specialization in order to determine how much weight to assign the opinion. *See* 20 C.F.R. § 404.1527(d)(2)-(d)(6).  If the ALJ rejects a treating or examining doctor's opinion that is contradicted by another doctor, he must provide specific, legitimate reasons based on substantial evidence in the record. *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009); *Ryan*, 528 F.3d at 1198; *Orn*, 495 F.3d at 632; *Andrews*, 53 F.3d at 1043; *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting medical evidence, stating his

14

interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986).  In contrast, "[w]hen an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs.  In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 795 F.3d at 1012-13 (internal citation omitted).

B.  <u>The ALJ Properly Weighed the Medical Opinions Regarding Plaintiff's Physical Condition, but Erred in Weighing the Medical Opinions Regarding Plaintiff's Mental Condition</u>

The Court concludes that the ALJ properly weighed the medical opinions as to Plaintiff's physical impairments, but not those regarding his mental conditions.

The crux of Plaintiff's challenge is that the ALJ should have assigned more weight to Dr. Shore's opinion—in particular, the sit/stand option, unscheduled breaks, and absences from work that she forecasted.  The ALJ provided sufficient explanation for weighing the medical evidence to find that Plaintiff's physical condition did not require a sit/stand option, unscheduled breaks, or regular absences from work, and the medical evidence substantially supports this finding. However, the same is not true as to medical evidence of Plaintiff's mental health condition. Instead, there are parts of the record regarding Plaintiff's mental health that the ALJ had a duty to further develop but did not.

1.  *Physical Impairments*

The ALJ did not err by declining to treat Dr. Shore's opinion as controlling and instead giving great weight to the opinions of Drs. Schten and Pon.

As a threshold matter, it is unclear from the record whether Dr. Shore was a treating or examining physician.  Plaintiff contends that he previously saw Dr. Shore, and therefore the ALJ should have assigned her great weight as a treating physician.  There is some support for considering her as a treating physician with a long-term relationship with Plaintiff because Plaintiff testified that Dr. Shore had treated him on multiple occasions (AR 48), and her name

appears on several medical records.  (*See, e.g.*, AR 271, 291, 292, 293.)  Dr. Shore, however, noted that the date on which she examined Plaintiff was also her first time meeting him, suggesting she considered herself to be more an examining physician who lacks the long-term history with the patient that warrants assignment of greater weight.  (AR 409.)   Nonetheless, the Court need not determine whether Dr. Shore was a treating or examining physician, because even assuming that she was a treating physician, the ALJ met her burden of sufficiently explaining why she rejected Dr. Shore's opinion.

The ALJ gave Dr. Shore's opinion less weight than Dr. Schten's for three reasons:  first, because Dr. Shore's conclusion was inconsistent with the medical record and instead relied too much on Plaintiff's subjective testimony (AR 23); second, given her statement that she first saw Plaintiff on the day she completed the questionnaire, Dr. Shore's relationship with Plaintiff was limited (*id.*); and third, although Plaintiff insists that Dr. Shore's opinion supports the conclusion that Plaintiff cannot work, the ALJ found that Dr. Shore's documentation of his abilities was actually consistent with an ability to do sedentary work.  (AR 24.)  These reasons are supported by substantial evidence in the record.

First, Dr. Shore's conclusion was inconsistent with the medical record.  She identified only the right foot drop as Plaintiff's medical impairment.  (AR 409, 410.)  Yet, Dr. Shore did not provide any objective medical findings regarding the right foot drop to support her recommendation of a sit/stand limitation, unscheduled breaks, or three absences a month; to the contrary, she appears to have not been aware of or ignored Dr. Schten's opinion from May 2012 that Plaintiff "should not have any significant limitations in sitting, standing, handling objects, hearing, speaking, or traveling."  (AR 322.)  Thus, she appears to have relied heavily upon Plaintiff's subjective complaints.

Second, while Plaintiff testified that he had previously met Dr. Shore for refills or other ailments, there is no dispute that she had never previously treated Plaintiff for his right foot drop.  In fact, the medical records on which Dr. Shore's name appears do not relate to Plaintiff's foot drop.  (*See* AR 271, 291, 292, 293 (records regarding medicine refills or lab results).)   And, as the ALJ noted, Dr. Shore herself did not remember previously meeting Plaintiff for any reason.  (AR

United States District Court
Northern District of California

1    23.)  In any event, the day she completed her report was the first time she examined Plaintiff for

2    the right foot drop impairment.  The ALJ's finding that Dr. Shore had a limited relationship with

3    Plaintiff is thus supported by substantial evidence in the record.

4         Third, Dr. Shore's documentation is consistent with an ability to do sedentary work.

5    "Sedentary work involves lifting no more than 10 pounds at a time . . . Jobs are sedentary if

6    walking and standing are required occasionally."  20 C.F.R. § 404.1567.  Dr. Shore observed that

7    Plaintiff could sit for at least 6 hours and stand for less than 2 hours in an 8-hour workday,

8    suggesting that Plaintiff could stand and walk occasionally.  (AR 411.)  Although Dr. Shore did

9    not indicate how many pounds Plaintiff would be capable of carrying, her conclusions regarding

10   Plaintiff's ability to stand and sit are consistent with SSA regulations regarding sedentary work.

11   Further, regulations direct the ALJ to consult a VE in instances where, as here, an individual's

12   limitations do not meet a "defined exertional capacity," and they must instead alternate between

13   sitting and standing because they are not functionally capable of doing the prolonged sitting

14   contemplated in the definition of sedentary.  *Gallant v. Heckler*, 753 F.2d 1450, 1457 (9th Cir.

15   1984.)  Here, the ALJ correctly consulted the VE who testified that the sit/stand option did not

16   affect the ultimate result that Plaintiff could perform sedentary work.  (AR 54-55.)  Therefore, the

17   ALJ did not err in finding Dr. Shore's observations consistent with Plaintiff's ability to perform

18   sedentary work.

19        Plaintiff's insistence that Dr. Shertock's observations of his balance problems support Dr.

20   Shore's recommendation for a sit/stand option is unavailing.  Dr. Shertock is a psychologist, not a

21   medical physician qualified to give an opinion on Plaintiff's physical impairments.  *See Smolen v.*

22   *Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) ("[T]he opinions of a specialist about issues related to

23   his or her specialty are given more weight than the opinions of a nonspecialist." (citations

24   omitted)).  Further, Dr. Shertock wrote "no impairment in gait was noted," a conclusion she drew

25   based on what she actually observed rather than what Plaintiff reported.  (AR 301.)  Thus, her

26   opinion does not provide support for the sit/stand option Dr. Shore endorsed.

27        Rather than credit Dr. Shore, the ALJ gave great weight to Dr. Schten's opinion that

28   Plaintiff's right foot drop does not impose any significant limitations.  (AR 23.)  The ALJ did so

United States District Court
Northern District of California

because of Dr. Schten's status as treating physician and because his conclusion that the foot drop did not disable Plaintiff was consistent with other medical evidence. (*Id*.) Substantial evidence also supports the ALJ's decision in this regard.

The evidence shows that Dr. Schten was Plaintiff's treating physician. "By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians. If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." *Orn*, 495 F.3d at 631 (internal citations and quotation marks omitted); *see also* 20 C.F.R. §§ 404.1527; 404.1527(d)(2). Dr. Schten's conclusions regarding Plaintiff's physical ailments are consistent with the medical record as a whole—his findings of Plaintiff's foot drop, asthma, sinus issues, BPH, and urinary issues are well documented throughout the record. (*Compare* AR 322 (Dr. Schten's letter), *with* AR 270-277, 296 (records tracking Plaintiff's conditions consistent with Dr. Schten's findings).) Dr. Schten's documentation demonstrates familiarity with Plaintiff's various health issues. *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 ("The opinion of a treating physician is given deference because he is employed to cure and has a greater opportunity to know and observe the patient as an individual." (internal citations and quotation marks omitted)).

Further, even if the ALJ did not give Dr. Schten's opinion the controlling weight it was due, the record still supports her decision to assign his opinion "great weight." (AR 23.) Several records document Dr. Schten as Plaintiff's physician. (*See, e.g.*, AR 296, 331, 387.) These records indicate that Plaintiff had been under Dr. Schten's care for over 2 years. (*Id*.) The length of their relationship supports the weight the ALJ afforded Dr. Schten. *See* 20 C.F.R. § 404.1527(c)(2)(i) (noting that when an ALJ does not assign a treating opinion controlling weight, the ALJ should assign more weight to the medical source the longer the treatment relationship). Thus, the evidence demonstrates both that Dr. Schten was a treating physician and that his medical opinion was supported by the record.

Plaintiff's assertion that Dr. Schten's conclusions were too vague is unpersuasive. To be sure, Dr. Schten's letter contains some vague statements regarding the extent of Plaintiff's limitations. (*See, e.g.*, AR 322 (noting that Plaintiff would be "limited *somewhat* in terms of

18

walking and carrying" (emphasis added)).)  But Dr. Schten goes on to report unambiguously that Plaintiff should have no significant limitations when it comes to sitting or standing—or other physical motions, for that matter, including handling objects, hearing, speaking, or traveling.  (*Id*.)  In direct contrast to Dr. Shore, nothing in Dr. Schten's letter even hints that a sit/stand option is required, or that Plaintiff would need unscheduled breaks or regular absences from work.  Thus, Plaintiff's contention that Drs. Schten and Shore's opinions were actually consistent holds no water.

The ALJ also assigned great weight to Dr. Pon's opinion as an examining physician because of its consistency with the other evidence.  (AR 21.)  Dr. Pon's diagnosis of chronic low back pain, chronic left hip pain, chronic residual right knee pain and numbness, and a complete right foot drop, accurately reflects the evidence documented in Plaintiff's medical records.  (*See, e.g.*, AR 270-277, 282, 283, 285 (medical records tracking Plaintiff's right foot drop and pain in the lower back, left hip, and right knee).)  He also identified x-rays of both Plaintiff's right knee and left hip showing normal or mild results.  (AR 306.)  *See* 20 C.F.R. § 404.1525(a)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").  Additionally, Dr. Pon conducted a thorough physical examination of Plaintiff further crediting his medical conclusions.  (AR 307.)  Ultimately, this determination, too, finds substantial support in the record.

Regarding Plaintiff's functional capacity, Dr. Pon concluded that claimant could stand and/or walk for 4 to 6 hours in an 8-hour workday; sit for 6 hours; and occasionally stoop, crouch, kneel, squat, climb stairs, ladders, and crawl.  (AR 308.)  Dr. Pon also found that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  (*Id*.)  He concluded that, despite the pain in his right knee, Plaintiff could still perform pushing right leg and foot control frequently.  (*Id*.)

Plaintiff contends that Dr. Pon's observations regarding Plaintiff's gait support Dr. Shore's finding for a sit/stand option (Dkt. No. 17 at 18), but Dr. Pon's opinion appears to compel the opposite result.  Indeed, Dr. Pon wrote that Plaintiff's gait was "stable."  (AR 307.)  Although Dr. Pon noted that Plaintiff's speed and stride length were slightly less than normal and that he had some knee pain when squatting, Dr. Pon observed that Plaintiff sat comfortably during the exam

United States District Court
Northern District of California

United States District Court
Northern District of California

1    and was able to sit and stand normally.  (*Id.*)  Having specifically examined and addressed

2    Plaintiff's gait, ability to sit and stand, and knee pain, although Dr. Pon recommended limiting

3    stooping, crouching, kneeling, and squatting, he did not recommend any sit/stand option or other

4    limitation related to sitting and standing.  Thus, Dr. Pon's opinion is consistent with Dr. Schten

5    and does not support Dr. Shore's conclusion that a sit/stand option was needed.

6         In sum, substantial support in the record demonstrates that the ALJ properly considered the

7    medical evidence regarding Plaintiff's physical condition.

8                    2.    *Mental Health Impairments*

9         The Court reaches a different conclusion as to the ALJ's consideration of the medical

10   evidence regarding Plaintiff's mental impairments.

11        Dr. Shertock diagnosed Plaintiff with polysubstance dependence (noting uncertainty

12   regarding his use of drugs at the time), mood disorder, generalized anxiety, PTSD, personality

13   disorder, and a GAF of 50.  (AR 303.)  She opined that Plaintiff could maintain concentration and

14   perform simple repetitive tasks, but that he would have difficulty adapting to work stress and

15   maintaining a schedule on a consistent basis.  (*Id.*)  The ALJ generally accepted Dr. Shertock's

16   opinion (AR 22), except she discounted Dr. Shertock's finding of a GAF score of 50 by attributing

17   it to Plaintiff's substance abuse.  (AR 23.)

18        Although Plaintiff admitted to using methamphetamine in the distant past, he told Dr.

19   Shertock that he had not done so for the past six years.  (AR 301.)  Dr. Shertock opined that

20   Plaintiff's behavior during the examination was "reminiscent of someone currently or recently

21   using methamphetamines" and that when he returned to the clinic a few days later "he was

22   exhibiting behavior even more consistent with methamphetamine intoxication."  (*Id.*)  In the end,

23   however, Dr. Shertock was uncertain as to how much, if at all, Plaintiff's mood disorder and

24   anxiety could be attributed to use of methamphetamine.  (*See* AR 302 ("It is not clear to what

25   extent his symptoms can be partly attributed to methamphetamine abuse.  PTSD from his

26   childhood abuse could also be a factor in the anger management difficulties.").)  In reaching her

27   finding the ALJ also considered medical records documenting Plaintiff's alcohol and marijuana

28   use.  (AR 23, 326, 329.)  However, mental health nurse practitioner Mr. Miller—who had been

                                    20

1    seeing Plaintiff for several years—reported that Plaintiff had never showed signs of

2    methamphetamine intoxication.  (AR 22.)

3           A resolution of conflict in medical testimony is generally a role reserved for the ALJ;

4    however, "[t]he ALJ has a duty to develop the record . . . even when the claimant is represented by

5    counsel." *Delorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991); *see also Andrews*, 53 F.3d at

6    1039.  "A specific finding of ambiguity is not necessary to trigger this duty to inquire, where the

7    record establishes ambiguity or inadequacy." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.

8    2001).  The record regarding Plaintiff's substance abuse and its impact on his symptoms is unclear

9    at best.  While Dr. Shertock suggests that Plaintiff's symptoms may be caused by substance abuse,

10   in the end she does not opine that it is, instead retreating to the belief that it simply "is not clear."

11   (AR 302.)  In light of this uncertainty, the ALJ had a duty to investigate further rather than relying

12   on ambiguous facts.  In this regard, the ALJ's conclusion about Plaintiff's mental health condition

13   was not based on substantial evidence.

14          Additionally, the ALJ assigned Dr. Shertock's opinion great weight, but failed to explain

15   why she nevertheless rejected portions of Dr. Shertock's findings.  Specifically, the ALJ notes Dr.

16   Shertock's observation that Plaintiff may face difficulty in maintaining a consistent schedule;

17   however, she does not provide any explanation about how this particular opinion about Plaintiff's

18   inability to maintain a schedule informs her analysis.  In other words, the ALJ relies on only some

19   parts of Dr. Shertock's analysis in reaching her conclusion that Plaintiff suffers only mild mental

20   health issues.  (AR 22-23.)  But beyond attributing Plaintiff's lower social functioning to possible

21   drug use, the ALJ does not acknowledge Dr. Shertock's opinion that Plaintiff "*would* have

22   difficulty maintaining a schedule." (AR 22, 303 (emphasis added).)  Although an ALJ need not

23   discuss evidence that is neither significant nor probative, Dr. Shertock's statement about

24   Plaintiff's ability as a reliable employee cannot reasonably be characterized as insignificant.

25   *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1008, 1012 (9th Cir. 2003).  This information speaks

26   directly to Plaintiff's ability to work—at least, to maintain employment.

27          Dr. Shertock's observation is consistent with the opinion of Mr. Miller, a nurse practitioner

28   specializing in psychology who saw Plaintiff regularly.  The ALJ does not acknowledge that both

United States District Court
Northern District of California

21

mental health providers reached similar conclusions regarding Plaintiff's ability to maintain a schedule; instead, the ALJ points to evidence documenting improvement in Plaintiff's mental health to prove the mild nature of his impairments. However, "[t]hat a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace." *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001). Ultimately, the ALJ should have sought clarification regarding inconsistent parts of the record and addressed the potentially conflicting evidence Dr. Shertock's opinion raised.

The ALJ also erred by failing to assign any weight to Mr. Miller's opinion. SSA regulations treat nurse practitioners as a "medical source." 20 C.F.R. § 404.1513(d)(1). "When an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs." *Alcala v. Colvin*, No. 13-CV-05344-JSC, 2014 WL 4100667, at *7 (N.D. Cal. Aug. 20, 2014) (internal citations omitted). Here, the ALJ did not explicitly reject Mr. Miller's opinion, but instead relied on Dr. Schten's letter. However, the ALJ appears to have relied on Mr. Miller's medical findings to a limited extent—identifying the progress Mr. Miller noted in Plaintiff's psychological condition while ignoring Mr. Miller's other notes to the contrary. For example, the ALJ refers to medical records from Mr. Miller noting improvements to Plaintiff's mental health with medications and GAF scores of 60. (AR 265, 267, 342.) Meanwhile, the ALJ does not discuss Mr. Miller's statement that Plaintiff's mental health conditions "significantly impact his social and work life." (AR 323.)

The ALJ's treatment of Mr. Miller's opinion is all the more inadequate given the ALJ's assignment of great weight to Dr. Schten's opinion on all issues: Dr. Schten explicitly deferred to Mr. Miller regarding Plaintiff's mental health issues stating, "It appears the largest portion of [Plaintiff's] disability has been due to mental illness issues . . . I will defer comment on his mental health issues to Aaron Miller." (AR 322.) Dr. Schten made explicit that he was not the authority on Plaintiff's mental health issues—rather, Mr. Miller was. (*Id.*) The ALJ does not address this distinction. If anything, Dr. Schten's allusion to a possible disability on the basis of mental health only further necessitated that the ALJ more thoroughly analyze Mr. Miller's treatment notes,

including his finding as to the impact of Plaintiff's mental health on his work life.

In sum, the ALJ's finding as to Plaintiff's mental health impairments is not supported by substantial evidence. The ALJ's rejection of Dr. Shertock's opinion as to Plaintiff's ability to maintain work based on ambiguous statements about his alleged drug use was not reasonable; the record was uncertain at best. Further, the ALJ seems to have relied on some of Mr. Miller's medical findings while ignoring others without explanation. Notably, this renders the ALJ's determination that there was no mental disability insufficient, but also calls into question whether the ALJ properly considered the possibility that the combined effect of physical and mental impairments rendered Plaintiff disabled. Under such circumstances, remand for further consideration is required.

## II.    The ALJ's Consideration of Plaintiff's Subjective Pain Testimony

Plaintiff next asserts that the ALJ failed to sufficiently justify her finding not credible Plaintiff's subjective complaints about his condition. (Dkt. No. 17 at 18-19.) The ALJ did not err in her evaluation of Plaintiff's testimony.

### A.    The Standard for Assessing Credibility

"An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." *Garrison*, 759 F.3d at 1014. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal citations and quotation marks omitted). "Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (internal citations and quotation marks omitted). However, the ALJ is not "required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Most commonly, a claimant's credibility is called into question where his or her complaint is about "disabling pain that cannot be objectively ascertained." *Orn*, 495 F.3d at 637. "In weighing a claimant's credibility, the ALJ

may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

B.     The ALJ Properly Assessed Plaintiff's Credibility

Applying the two-step analysis, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." (AR 21.)  The ALJ did not find that Plaintiff was malingering; she thus was required to set forth specific, clear and convincing reasons for rejecting Plaintiff's pain testimony under the second prong of the test, *see Lingenfelter*, 504 F.3d at 1036, and to consider the relevant factors, *see Light*, 119 F.3d at 792.  A review of the record indicates that the ALJ did just that.

The ALJ explained that she found Plaintiff's subjective complaints not credible given the evidence of his activities of daily living, as reported at his hearing and written reports, and inconsistences between these self-reports and testimony from physicians.  (AR 22-23.)  Although subjective pain testimony that is not fully corroborated by objective medical evidence is relevant to determining the severity of Plaintiff's pain and its disabling effects, it cannot be the sole reason to discredit subjective complaints of pain.  *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2011).  Thus, the Court must consider the ALJ's other reasons for rejecting Plaintiff's subjective reports of pain beyond the lack of corroborating clinical evidence.

1.     *The ALJ Properly Considered Plaintiff's Activities of Daily Living*

When evaluating credibility, an ALJ may consider "the claimant's daily activities."  20 C.F.R. §§ 404.1529(c)(3)(i), 416.919(c)(3)(i); *see also Fair*, 885 F.2d at 603 (stating that the claimant's daily activities may be evidence upon which an "ALJ can rely to find a pain allegation incredible.").  An ALJ "may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting." *Molina*, 674 F.3d at 1113 (internal citations and quotation marks omitted).  Moreover, "[e]ven where those activities suggest some difficulty functioning, they may [still] be grounds for

24

discrediting the claimant's testimony to the extent that they contradict claims of totally debilitating impairment." *Id.* In assessing a claimant's credibility, in addition to the claimant's daily activities, the SSA requires ALJs to consider additional factors, including: whether the claimant takes medication or undergoes other treatment for the symptoms; whether the claimant fails to follow a prescribed course of treatment without adequate explanation; and whether the alleged symptoms are consistent with the medical evidence. *Lingenfelter*, 504 F.3d at 1040; *see also Rollins*, 261 F.3d at 857; *Fair*, 885 F.2d at 602-03.

Here, the ALJ accurately detailed Plaintiff's activities of daily living, considered his medication regimen, and the consistency of the alleged symptoms with the medical evidence. Specifically, the ALJ noted that Plaintiff:

> [I]s able to concentrate to watch television for four hours a day, has no problems with lifting, is able to take care of his personal needs takes no medications to help him sleep even though he wakes up from having panic attacks, helps his wife with the dishes and vacuuming, and helps his four children with their homework. His testimony that he needs to lie down for two-thirds of the days is not supported by the mild objective evidence as discussed herein. He only takes over the counter Motrin and Tylenol, which helps manage his pain.

(AR 22.) The ALJ challenged Plaintiff's testimony by pointing to his activities of daily living as well as medical evidence attesting to the mild nature of Plaintiff's impairments. Although the SSA does not require claimants be "utterly incapacitated," a specific finding as to a claimant's ability to spend a substantial part of his day engaged in activities involving the performance of physical activity transferable to a work setting may be sufficient to discredit allegations of severe pain. *Fair*, 885 F.2d at 603. In this instance, the ALJ found, based on Plaintiff's testimony, self-reports, and his wife's third-party statement that Plaintiff spends a fair amount of his time engaged in activities other than lying down. (*See, e.g.*, AR 43, 46, 50, 179, 180.) The ALJ noted that Plaintiff's ability to take the children to school, help them with homework, feed the dogs, take his wife to the bus stop, go grocery shopping, and take care of household chores "show that he is able to do more than he alleges." (AR 24.) With these statements, the ALJ provided a specific, clear and convincing account of how those activities contradict the alleged severity of Plaintiff's impairments.

United States District Court
Northern District of California

In addition, because Plaintiff testified to adequately treating his pain using over the counter drugs, the ALJ reasonably discredited Plaintiff's testimony of suffering "excruciating" pain in his hip.  (AR 40.)  *See Parra v. Astrue*, 481 F.3d 742, 751 ("We have previously indicated that evidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an impairment." (internal citations and quotation marks omitted)).  Although the records indicate that Plaintiff was prescribed pain medications, Plaintiff testified to his preference for over-the-counter medication.  (AR 40, 271-277.)  The ALJ also referred to x-ray results noting "minimal findings" in the right knee and a normal lumbar spine as medical evidence inconsistent with Plaintiff's testimony.  (AR 23.)  *See Parra*, 481 F.3d at 751 (ALJ provided clear and convincing reasons for discrediting plaintiff's testimony by pointing to lab results establishing that knee function was within normal limits).  Similarly, the ALJ referred to normal endoscopy results to discount Plaintiff's testimony regarding stomach problems.  (AR 22-23.)  In considering Plaintiff's daily routine, his preferred course of treating his pain, and the medical evidence, the ALJ drew upon specific, clear and convincing reasons for rejecting claimant's testimony.  Thus, the ALJ did not err in discrediting Plaintiff's testimony of subjective physical pain.

2.  *The ALJ's Discrediting of Plaintiff's Testimony Regarding Side Effects of the Depression Medication was Harmless*

Plaintiff also challenges the ALJ's credibility finding on the ground that the ALJ improperly overlooked medical evidence regarding the side effects of Plaintiff's depression medication.  (Dkt. No. 17 at 19.)  Plaintiff testified that he stopped taking certain unspecified psychotropic medications because they made him feel "more depressed."  (AR 43-44.)  In support of this side effect—increased depression—Plaintiff points to medical records documenting his increased irritability as a result of taking Wellbutrin.  (Dkt No. 17 at 19; *see also* AR 263, 264.)  The ALJ discredited Plaintiff's testimony that medications made him feel "more depressed" based on her belief that the side effect of increased depression was not reflected in the treatment records.  (AR 23.)

The ALJ failed to consider the note in Plaintiff's record that Wellbutrin had been making him increasingly irritable.  (*See* AR 263 (stating "decrease Wellbutrin to 150mg qd to reduce

United States District Court
Northern District of California

1  irritability").)  While the record as a whole indicates overall improvement to Plaintiff's symptoms

2  of depression (*see, e.g.*, AR 324, 342), this alone does not contradict Plaintiff's statement that the

3  depression drugs made him more irritable.  Nor is it the rationale the ALJ used to discredit

4  Plaintiff's testimony; instead, contrary to the record, the ALJ stated that Plaintiff's reported side

5  effect of increased irritability was not reflected in the record.

6           Nonetheless, the ALJ's failure to consider the note in the record constitutes a harmless

7  error.  An error is harmless where the ALJ provides one or more invalid reasons for discrediting a

8  claimant's testimony, but also provides valid reasons that were supported by the record.  *Molina*,

9  674 F.3d at 1115; *see also Batson*, 359 F.3d at 1197 (concluding that even if the record does not

10  support one of the ALJ's reasons for discrediting a claimant's testimony, the error is harmless).  In

11  this context, an error is harmless so long as there is still substantial evidence supporting the ALJ's

12  decision and the error does not negate the rationale of the ALJ's ultimate conclusion.  *Molina*, 674

13  F.3d at 1115.  As previously discussed, the ALJ provided sufficient reasoning for discounting

14  Plaintiff's testimony based on medical records documenting his daily activities, his moderate

15  course of pain treatment, and the mild nature of Plaintiff's condition.  Thus, although the ALJ

16  provided one invalid reason for discrediting the Plaintiff's testimony, she also provided valid

17  reasons supported by the record for doing so such that the oversight is harmless.

18  **III.     The ALJ's Assessment of Plaintiff's RFC & the Hypothetical Posed to the VE**

19           Lastly, Plaintiff challenges the ALJ's decision on the ground that that the ALJ's RFC

20  determination, and in turn, the hypothetical she posed to the VE, lacked substantial evidentiary

21  support.  The ALJ presented the VE with a hypothetical that reflected all relevant physical

22  evidence, but—given the above discussion—may have given Plaintiff's mental health condition

23  short shrift.

24           A.       The Standard for Relying on VE Testimony

25           The ALJ's RFC determination and VE hypothetical come into play during the final steps

26  of the ALJ's five-step analysis.  If, at step four, "a claimant shows that he or she cannot return to

27  his or her previous job, the burden of proof shifts to the Secretary to show that the claimant can do

28  other kinds of work."  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).  Thus, "[a]t step five,

the ALJ can call upon a [VE] to testify as to:  (1) what jobs the claimant, given his or her [RFC], would be able to do; and (2) the availability of such jobs in the national economy." *Tackett*, 180 F.3d at 1101.  The ALJ may pose hypothetical questions to the expert that "set out *all* of the claimant's impairments" for the VE's consideration.  *Gamer v. Sec'y of Health & Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987) (emphasis added).  "The ALJ's depiction of the claimant's disability must be accurate, detailed, and supported by the medical record." *Tackett*, 180 F.3d at 1101 (citations omitted).  "The testimony of a [VE] is valuable only to the extent that it is supported by medical evidence" and has "no evidentiary value if the assumptions in the hypothetical are not supported by the record." *Magallanes*, 881 F.2d at 756 (citations omitted). The VE then translates the factual hypotheticals the ALJ provides him into realistic job market probabilities by testifying to what types of jobs the Plaintiff may still be able to perform and whether an adequate number of such jobs are available regionally. *Tackett*, 180 F.3d at 1101 (citations omitted).

> ### B.   The Medical Record Only Partially Supported the ALJ's RFC and, in turn, the Hypothetical Relied Upon by the VE

Plaintiff alleges that the ALJ erred by failing to include in her RFC determination three relevant items:  Dr. Pon's observation that Plaintiff could only squat one-third of the way down in the RFC; Dr. Shore's proposed limitations regarding opportunity for unscheduled breaks and a sit/stand option; and Dr. Shertock's opinion regarding the difficulty Plaintiff might face in maintaining a work schedule.  (Dkt. No. 17 at 21.)  The Court will address each in turn.

The "Medical-Vocational Guidelines" of the Social Security regulations define "RFC" as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Part 404, Subpt. P, App. 2, § 200.00(c).  It is essentially a determination of what the claimant can still do despite his or her physical, mental, and other limitations.  *See* 20 C.F.R. § 404.1545(a).  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including, [among other things], medical records, lay evidence, and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (internal citations and quotation marks omitted); 20 C.F.R. §§ 404.1545(a)(3),

1    416.945(a)(3).

2         As noted above, in this matter the ALJ found that Plaintiff had the RFC to perform light

3    work subject to the following limitations:  lift and/or carry 20 pounds occasionally and 10 pounds

4    frequently, sit for 6 hours in an 8-hour workday, stand and/or walk for 2 hours, occasionally push

5    and/or pull with the right lower extremity, occasionally balance, stoop, kneel, crouch, and crawl,

6    and with caution to avoid fumes, odors, dust, gases, and poor ventilation.  (AR 20.)  Lastly, in

7    consideration of his mental health issues, the ALJ limited Plaintiff to unskilled work with only

8    occasional contact with the public.  (AR 20, 23, 24.)  The first part of this RFC squares with the

9    ALJ's obligations under the law; however, to the extent that the ALJ improperly considered

10   evidence regarding Plaintiff's mental health, as discussed above, the RFC may not have

11   incorporated an accurate or complete picture.

12        First, the ALJ gave great weight to Dr. Pon's opinion whose examination was consistent

13   with the medical evidence.  Dr. Pon observed Plaintiff's physical limitations and suggested that he

14   could occasionally stoop crouch, kneel, squat, climb stairs and ladders, crawl.  (AR 208.)  The

15   ALJ appears to have taken his observations into account by limiting Plaintiff's capacity to balance,

16   stoop, kneel, crouch, and crawl only occasionally.  (AR 20.)

17        Next, as discussed above, the ALJ properly weighed Dr. Shore's opinion and concluded

18   that portions of her opinion were unsupported by the record.  An ALJ is not required to

19   incorporate into the RFC a physician's opinion that has been properly discounted.  *Batson*, 359

20   F.3d at 1197.  Thus, for the reasons described in Part I, Section (B)(1), *supra*, the ALJ had no

21   obligation to include the sit/stand option that Dr. Shore recommended in the RFC.  But even so,

22   the ALJ nonetheless did:  the ALJ specifically asked the VE whether a sit/stand option—in

23   particular, the requirement that an individual be allowed to alternate between sitting for 30

24   minutes and standing for 5 minutes throughout the day—would change the results of his

25   testimony.  (AR 54.)  The VE answered in the negative:  inclusion of this limitation in the

26   hypothetical did not change the VE's conclusion that such an individual could perform a reduced

27   level of light unskilled work as well as sedentary unskilled work.  (AR 52, 54.)  Thus, Plaintiff's

28   lament that the RFC and VE hypothetical did not pay sufficient heed to Dr. Shore's opinion is

United States District Court
Northern District of California

United States District Court
Northern District of California

1  unavailing.

2          Plaintiff's final challenge to the RFC and VE hypothetical is more complicated.  Plaintiff

3  argues the ALJ failed to explicitly mention Dr. Shertock's opinion that Plaintiff "would have

4  difficulty maintaining a schedule on a consistent basis." (AR 303.)  However, the ALJ asked the

5  VE whether his analysis would change if an individual had to be absent from work three times per

6  month. (AR 55.)  The VE responded that there would be no jobs in the market for such an

7  individual because an employer would not allow that many absences. (*Id.*)  Thus, contrary to what

8  Plaintiff argues, the ALJ did explicitly ask the VE about the consequences of an inconsistent

9  schedule on one's ability to work.

10          Although the ALJ asked the VE about the effect absences would have on Plaintiff's ability

11  to work, the ALJ did not use this portion of the VE's testimony to inform her ultimate conclusion.

12  As previously discussed in Part I, Section (B)(2), *supra*, the ALJ did not properly consider

13  portions of Dr. Shertock's and Mr. Miller's evaluations of Plaintiff's mental health impairments

14  and the effects of those impairments on his ability to work.  Based only on Plaintiff's physical

15  limitations, the ALJ's hypothetical was based on substantial evidence.  However, given that the

16  record was not sufficiently developed regarding Plaintiff's mental capacity, the RFC limitation of

17  "occasional contact with the public" may not have adequately encompassed Plaintiff's mental

18  health restrictions.

19                                        **CONCLUSION**

20          The ALJ did not err in her treatment of Dr. Shore's and Dr. Schten's opinions as they

21  relate to Plaintiff's physical limitations.  However, the ALJ's use of only parts of Dr. Shertock's

22  opinion as to Plaintiff's mental health was not based on substantial evidence in the record.  In

23  addition, the ALJ failed to properly consider Mr. Miller's mental health opinion.  Lastly, although

24  the RFC properly encompassed Plaintiff's physical capacity, the ALJ may have prematurely

25  dismissed Plaintiff's mental health limitations without sufficient medical evidence to support her

26  conclusions.

27          The Court has discretion to determine whether to reverse or remand a social security case.

28  *Lewin v. Schweiker*, 654 F.2d 631, 635-36 (9th Cir. 1981); *Harman v. Apfel*, 211 F.3d 1172, 1178

1   (9th Cir. 2000). "If additional proceedings can remedy defects in the original administrative

2   proceedings," the case should be remanded.  *Lewin*, 654 F.2d at 635.  Here, remand is warranted

3   because additional proceedings may remedy the defects in the ALJ's analysis.

4          For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiff's motion for summary

5   judgment (Dkt. No. 17) is GRANTED IN PART and Defendant's cross motion for summary

6   judgment (Dkt. No. 20) is DENIED.  The Court REMANDS this case to the Commissioner for

7   further proceedings consistent with this order.

8          **IT IS SO ORDERED**.

9

10  Dated:  March 12, 2015

11

12  _____

    JACQUELINE SCOTT CORLEY
    United States Magistrate Judge